IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| MEDIACOM COMMUNICATIONS CORPORATION,<br>Plaintiff,<br>v.<br>SINCLAIR BROADCAST GROUP, INC.,<br>Defendant. | * | 4:06-cv-491<br><br>ORDER ON MOTION FOR PRELIMINARY INJUNCTION |

Plaintiff, Mediacom Communications Corporation ("Mediacom"), brings this action against Defendant, Sinclair Broadcast Group, Inc. ("Sinclair"), asserting violation of the Sherman Antitrust Act (15 U.S.C. § 1), tortious interference with contracts and business expectations, and unfair competition. Clerk's No. 1. The Court has before it Plaintiff's Motion for Preliminary Injunction and Request for Expedited Relief, filed on October 11, 2006 (Clerk's No. 4) pursuant to Federal Rule of Civil Procedure 65(b), and Sinclair's Motion to Strike or, in the Alternative, to Grant Leave to Respond to Mediacom's Reply, filed on October 23, 2006 (Clerk's No. 34). Mediacom is seeking to enjoin Sinclair from terminating the existing retransmission agreement which allows Mediacom to carry Sinclair's broadcast stations, and from initiating any active marketing campaign designed to induce Mediacom subscribers to discontinue services with Mediacom. Sinclair filed a Resistance on October 17, 2006. Clerk's No. 18. Oral arguments on the Motion for Preliminary Injunction were heard on October 18, 2006. Clerk's No. 27. Additional briefing followed the preliminary injunction hearing. *See* Clerk's Nos. 28, 31-33. The matter is fully submitted. For the reasons discussed below,

Mediacom's Motion for Preliminary Injunction is DENIED.[1]

I. FACTUAL BACKGROUND

Mediacom owns franchised cable television systems which provide multiple television services in a number of metropolitan areas. Pl.'s Mem. of Law Supp. Mot. for Prelim. Inj. (hereinafter "Pl.'s Mot.") at 3; Compl. ¶ 1. Essentially, Mediacom provides cable television services to consumer viewers. Sinclair is a television broadcasting business which focuses on acquisition, development, and operation of television stations in small and medium sized markets in the U.S. Compl. ¶ 2. Sinclair owns major, and non-major, network affiliated television stations. Pl.'s Mot. at 2. Both companies operate in the following television Designated Market Areas ("DMAs"): St. Louis, Des Moines-Ames, Cedar Rapids, Lexington, Mobile-Pensacola, Champaign-Springfield-Decatur, Madison, Greenville-Spartanburg-Ashville, Peoria-Bloomington, Nashville, Tallahassee, Paducah-Cape Girardeau, Minneapolis, Milwaukee, Birmingham, and Norfolk. *Id.* at 3-4. Mediacom has approximately 625,000 households that receive Sinclair's broadcast stations, of which 325,000 are households in Iowa. Supp. Decl. of John Pascarelli (hereinafter "Pascarelli Supp.") ¶ 5.

Under Section 325(b) of the Communications Act of 1934, as amended, Sinclair, as a broadcast station, must elect a "retransmission consent" or a "must-carry" status with cable operators. Pl.'s Mot. at 2 n.1. Once Sinclair makes an election, it is effective for three years and cannot be changed until the following three year cycle. *Id.* "Retransmission consent" is a

1. Although both parties have filed certain documents under seal, the Court does not believe that this Order discloses any "confidential business proprietary" information. However, if either party believes that such disclosures were made, the party may petition the Court to file the present Order under seal.

federally created statutory right in a television station's broadcast signal, as opposed to the contents of the signal (which are protected by copyright) that broadcasters may attempt to sell in that station's local market. *Id.* If Sinclair elects "retransmission consent" status with a cable operator, the parties will negotiate in good faith for the retransmission rights. Pl.'s Mot. Ex. C (Decl. of James A. Levinsohn, hereinafter "Levinsohn") at 10. If Sinclair elects "must-carry" status with a cable operator, the cable operator is required to carry the television station's broadcast signal, without any compensation to either Sinclair or the cable operator. *See* Pl.'s Mot. at 2 n.1; Levinsohn at 11. Thus, popular stations generally elect "retransmission consent," and less popular stations elect "must-carry," since cable operators would not otherwise choose to carry the less popular stations without compensation. Levinsohn at 11.

On September 29, 2005, Sinclair informed Mediacom that it had elected "retransmission consent" status for all twenty-two Sinclair stations currently carried by Mediacom. Pl.'s Mot. at 4. Mediacom initially carried Sinclair's stations pursuant to a retransmission agreement signed on December 23, 2002. *Id.* at n.2. The 2002 retransmission agreement, which remains in effect, contains an extension clause that allows Mediacom to carry Sinclair's stations on a month-to-month basis. *Id.* The extension clause automatically renews on a monthly basis, and is subject to termination with respect to one or more stations by either party, with 45 days advance written notice. *Id.*; Pl.'s Mot. Ex. A (Decl. of John Pascarelli, hereinafter "Pascarelli"), Exs. 2, 3.

In October of 2005, Mediacom contacted Sinclair to initiate negotiations for the retransmission rights for the January 1, 2006 to December 31, 2008 cycle. Pascarelli ¶ 4. During negotiations, Sinclair stated that it expected to be paid cash for retransmission rights for each of its twenty-two stations. Pl.'s Mot. at 4. Traditionally, Sinclair allowed cable companies,

including Mediacom, to carry analog signals for free, and generally sought compensation only for new digital signals. Decl. of Barry Faber (hereinafter "Faber") ¶ 7. However, Sinclair realized that satellite companies, who competed with cable companies, were willing to pay for the same analog signals. *Id.* ¶ 9. Sinclair also became increasingly aware of the amount cable companies routinely paid for other non-broadcast stations, e.g., TNT, HGTV, and Animal Planet. *Id.* ¶ 10. Thus, for the first time in 2005, Sinclair began actively seeking compensation for analog signals from cable companies. *Id.* ¶ 11.

Mediacom responded by stating that it would only consider purchasing the retransmission rights for the thirteen Sinclair stations which were affiliated with major networks. Pl.'s Mot. at 4. These thirteen stations consisted of: KBSI, KDNL, KDSM, KGAN, WDKY, WEAR, WICD, WICS, WLOS, WMSN, WYZZ, WZTV, and WTWC (collectively referred to as "the Tying Stations"). Mediacom informed Sinclair that it was not interested in negotiating retransmission rights for the other nine stations: WUCW, WMYA, WCGV, WVTV, WDBB, WDKA, WNAB, WUXP, and WTVZ (collectively referred to as "the Tied Stations").[2] *Id.* at 4-5. Mediacom explained that carrying the Tied Stations was of little value due to low subscriber demand, and believed that freeing up the channels currently occupied by the Tied Stations would benefit Mediacom. *Id.* at 5, Ex. B (Decl. of Jane Bedford, hereinafter "Bedford") ¶ 3. Throughout negotiations, Sinclair continued to refuse any offers made by Mediacom that were anything less than a "global agreement" for all twenty-two stations. *See* Pascarelli ¶ 12.

---

[2] Whether Mediacom was negotiating for the retransmission rights of the Tied Stations is vigorously contested. Mediacom alleges that it was not negotiating for the retransmission rights of the Tied Stations, while Sinclair asserts that Mediacom was negotiating for the retransmission rights of the Tied Stations, but that Mediacom just did not wish to pay for those rights.

After almost eight months of unsuccessful negotiations, in June of 2006, Sinclair threatened to terminate the existing retransmission agreement. *Id.*¶ 13. On June 14, 2006, Sinclair allegedly informed Mediacom that Sinclair had entered into an agreement with a Direct Broadcast Satellite ("DBS") company, either DirecTV or The Dish Network, both are direct competitors of Mediacom. *Id.* ¶ 18. Under the terms of Sinclair's agreement with the DBS company, Sinclair allegedly would be reimbursed for any lost advertising revenue due to any interruption or termination of its relationship with Mediacom, and Sinclair would receive consideration, monetary or otherwise, for each Mediacom subscriber that switched to the DBS company as a result of the same (the "Bounty Payment Agreement"). *Id.* Sinclair claims that the "agreement" between itself and the DBS company is mischaracterized. *See* Faber ¶¶ 59-61. Sinclair states that in late August or early September of 2006, unrelated to its negotiations with Mediacom, the Chairman of the FOX Affiliate Board completed a customer referral agreement with DirecTV, which allowed FOX affiliated stations to be compensated for new customers that were referred to DirecTV as a result of commercials DirecTV aired on the participating FOX stations.[3] *Id.* ¶ 61.

Regardless, after further negotiations between Mediacom and Sinclair failed, on September 28, 2006, Mediacom received written notice from Sinclair terminating the 2002 retransmission agreement. Pascarelli ¶ 25. The notice required Mediacom to terminate carriage of all twenty-two Sinclair stations by midnight, November 30, 2006. *Id.* Pursuant to Federal Communications Commission ("FCC") regulations, Mediacom, in turn, must provide

---

[3] This type of ad, known as a "Per Inquiry" ad, is apparently very common in the television industry. Faber ¶ 61.

subscribers with thirty days advance notice of changes in its programming services. *Id.* ¶ 26 Accordingly, if Mediacom's requested injunction is not granted, Mediacom must provide notice to its subscribers regarding the termination of carriage of the Sinclair stations no later than November 1, 2006. *Id.*

## II. LAW AND ANALYSIS[4]

The purpose of issuing a preliminary injunction in a lawsuit is to preserve the status quo and to prevent irreparable harm until the parties have a chance to conduct discovery and the court has an opportunity to hold more extensive hearings on the lawsuit's merits. *See Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 439 (1974); *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994). Federal Rule of Civil Procedure 65 authorizes the court to enter a preliminary injunction where appropriate. *See* Fed. R. Civ. P. 65(a). It is well established that a party is entitled to equitable relief only if there is no adequate remedy at law. *Taylor Corp. v. Seasons Greetings, LLC,* 403 F.3d 958, 967 (8th Cir. 2005).

The burden of establishing the propriety of a preliminary injunction is on the movant. *See Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994) (citing *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir. 1989) (en banc)). A preliminary injunction is an extraordinary form of relief and must be carefully considered. *See Calvin Klein Cosmetics, Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667 (8th Cir. 1987). This Court believes that the power to grant a preliminary injunction is an awesome power

---

[4] In the Complaint, Mediacom alleges antitrust violation, tortious interference with contracts and business expectations, and unfair competition. However, Mediacom's motion for preliminary injunction only addresses the antitrust claim. Accordingly, the Court will limit the preliminary injunction analysis to the antitrust claim.

invested in the district court, as it expedites the trial process and necessarily requires the Court to analyze the record carefully to determine whether Plaintiff has shown it will be irreparably harmed absent the issuance of the requested relief.

In this Circuit, the four-part test enunciated in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc) is applied to determine if preliminary injunctive relief is appropriate. The test set forth in *Dataphase* involves examining four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties and litigants; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Id.* at 113. The Eighth Circuit has determined that no single factor is dispositive; all factors must be considered and balanced to determine whether to grant a preliminary injunction. *See Int'l Ass'n of Machinists and Aerospace Workers v. Schimmel*, 128 F.3d 689, 692 (8th Cir. 1997). Accordingly, this Court will consider each of the four factors in turn.

A. *Irreparable Harm*

The first factor that the Court must consider in its determination of whether or not to issue a preliminary injunction is the irreparable harm to Mediacom if the injunction is not granted. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir. 1996) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506-07 (1959)). Absence of irreparable injury is sufficient grounds to deny a preliminary injunction. *See Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir. 1989).

In support of this factor, Mediacom states that if Sinclair is allowed to terminate the

retransmission contract, it would irreparably harm Mediacom's reputation, goodwill, and business. Specifically, Mediacom argues that once it gives notice to its subscribers of the termination in carriage of the Sinclair stations, those subscribers who viewed Mediacom as the "ubiquitous source" for all major broadcast stations will become confused as to whether Mediacom can be trusted to deliver all of the local television stations important to them. Pl.'s Mot. at 15. Customers will lose confidence in Mediacom and switch to DBS companies, regardless of whether carriage of the Sinclair stations is eventually terminated. Once customers switch to DBS companies, such as DirecTV and/or The Dish Network, it would be difficult to "win back" the customers because DBS companies require twelve to twenty-four month subscription contracts.[5] *Id.* at 14-15. This would prevent former Mediacom subscribers from switching back in the short term.

Mediacom contends that Sinclair's advertising campaign would also cause irreparable harm. Sinclair's advertising campaign threatens to inform Mediacom subscribers that Mediacom is "refusing to carry" the stations, and would encourage Mediacom subscribers to switch to DBS companies. *Id.* at 15. This, Mediacom argues, would mislead subscribers to blame Mediacom for the loss of stations, and lead the subscribers to believe that Mediacom may never carry the affected stations ever again. *Id.* This would have the effect of encouraging subscribers to call local officials to pressure Mediacom to "agree to carry" the stations, which in turn would damage Mediacom's reputation among local government officials, who are responsible for granting Mediacom the right to do business. *See* Pascarelli ¶ 28. Additionally, Mediacom would lose revenue from local advertisers because they may cease to buy advertisement from

[5] Mediacom, on the other hand, provides an at-will basis subscription.

Mediacom out of fear of the diminished subscriber base. *Id.*

Moreover, Mediacom contends that if the preliminary injunction is not granted, consumers will be harmed. That is, those subscribers serviced with the Tied Stations will be forced to pay higher prices for stations that they do not value, and the channel lineup would not reflect subscriber preferences, but rather would reflect the preferences of Sinclair. This, in turn, would cause subscribers who prefer cable service to change services to DBS companies. *See* Levinsohn at 34-36. Mediacom reiterates that it would suffer a variety of harms which are impossible to measure if the preliminary injunction is not granted.

In opposition, Sinclair states that Mediacom's alleged injuries are not antitrust injuries.[6] Sinclair contends that under Section 26 of the Clayton Act, Mediacom must show that it has or will suffer an antitrust injury. 15 U.S.C. § 26 (stating injunctive relief for violation of the antitrust laws); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344-45 (1990) (concluding "antitrust injury" required for relief under Section 1 of the Sherman Act). Mediacom "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent. . . ." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Sinclair points out that the potential injuries raised by Mediacom flow from the

---

[6] Courts have analyzed the "antitrust injury" inquiry under different preliminary injunction rubric. Some courts discuss "antitrust injury" under the irreparable harm factor, *see Dos Santos v. Columbus-Cueno-Cabrini Med. Ctr.*, 684 F.2d 1346, 1350 n.4 (7th Cir. 1982); *Chemetron Corp. v. Crane Co.*, No. 77 C 2800, 1977 WL 1491 (N.D. Ill. Sept. 8, 1977), while other courts analyze "antitrust injury" under the likelihood of success on the merits factor, *see Black & Decker, Inc. v. Hoover Serv. Ctr.*, 765 F. Supp. 1129, 1141 (D. Conn. 1991); *Pennzoil Co. v. Texaco, Inc.*, No. 84-C-29-E, 1984 WL 164045 (N.D. Okla. Feb. 8, 1984). Still other courts have addressed "antitrust injury" separately from the preliminary injunction inquiry, and discussed it as a standing issue under the Clayton Act. *See AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 575-76 (7th Cir. 1999); *Original Appalachian Artworks, Inc. v. Granada Elec., Inc.*, No. 85 Civ. 9064, 1986 WL 2402 (S.D.N.Y. Feb. 20, 1986).

termination of the retransmission agreement, not the tying arrangement, and thus are unconnected to the alleged antitrust violation. *See id.* (finding injury must flow from that which makes the acts unlawful). Furthermore, Sinclair claims that when consumers decide to switch to DirecTV or The Dish Network because they offer more attractive programming, such choices among competing products are precisely what the antitrust laws were designed to foster. The Court agrees with Sinclair.

Here, Mediacom alleges potential injuries to its goodwill, reputation, and business relationship with local government officials. The alleged harm Mediacom asserts seems unlikely. For example, Mediacom submitted letters from local government officials who expressed concern over Mediacom's dispute with Sinclair, specifically in the way Sinclair was "forcing" Mediacom to purchase certain stations. *See* Pascarelli Supp. Exs. 1-10. The letters do not, in any way, indicate that the local government officials would blame Mediacom for the loss of stations or view Mediacom negatively because subscribers may call to complain about Mediacom's loss of stations. In fact, the letters tend to be sympathetic to Mediacom's situation and seem to blame Sinclair for the possible loss of stations.

Moreover, Mediacom's claim that the denial of the preliminary injunction would harm consumers is also misplaced. The "irreparable harm" to its subscribers that Mediacom alleges (higher prices for stations that subscribers do not value, or being forced to switch to the more expensive DBS companies) are not irreparable. Any harm that Mediacom subscribers may suffer is tangible. Mediacom subscribers who switch to DBS companies or invest in an antenna to view Sinclair stations can easily quantify the costs incurred as a result of the termination of programming. *See Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1272 (N.D. Iowa 1995)

(concluding irreparable harm cannot be established if money damages would adequately compensate the asserted harm).

As a general rule, antitrust laws were passed for the protection of competition, not competitors. Thus, inflicting painful losses on competitors "is of no moment to the antitrust laws if competition is not injured." *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 344 (8th Cir. 1995) (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993)). In this instance, although Mediacom's alleged "injury-to-goodwill [and reputation within the community may] constitute the sort of intangible injuries which may be found to be irreparable harm," Mediacom has not demonstrated that it has, or will, suffer an antitrust injury if the preliminary injunction is not granted. *Moore Bus. Forms, Inc., v. Wilson*, 953 F. Supp. 1056, 1062 (N.D. Iowa 1996); *see Mid-Am. Real Estate Co. v. Iowa Realty Co., Inc.*, 406 F.3d 969, 977 (8th Cir. 2005) (noting an injury is legally irrelevant if the conduct from which it stems is legal). In particular, Mediacom has failed to show how Sinclair's alleged illegal tying arrangement would result in harm to competition. As Sinclair points out, the injuries alleged by Mediacom flow from the termination of the current retransmission agreement, not from the alleged illegal tying arrangement. While it is true that subscribers may decide to switch to DBS companies or invest in an antenna to view Sinclair stations,[7] this does not amount to a showing of harm to competition. Indeed, Mediacom states that there will be a "decidedly harmful effect on . . . competition," but fails to explain how competition will be harmed, except to point to the possible harm to Mediacom's business, reputation, goodwill, and higher prices for subscribers.

---

[7] The Sinclair stations subject to termination of carriage by Mediacom are all available over the airwaves for free. Faber ¶ 19.

Pl.'s Mot. at 17; Levinsohn at 34-37. Surely Mediacom would be "in a worse position" if the transmission agreement is terminated than it would have been had Sinclair acquiesced to Mediacom's price proposals during negotiations, but that is insufficient to show antitrust injury. *See Brunswick*, 429 U.S. at 486 (concluding actions are condemned only when they may produce anticompetitive effects). Mediacom has not illustrated how the tying arrangement would harm competition, and thus, has not met its burden of demonstrating that it will suffer irreparable harm in the form of an antitrust injury. Accordingly, the Court finds that the irreparable harm factor weighs against granting the preliminary injunction.[8]

B. *Balance of Harms*

The second factor the Court must consider in deciding whether to issue a preliminary injunction is the state of the balance between Mediacom's alleged harm and the injury that granting the injunction will inflict on other parties or litigants. The analysis of this factor is different from the "irreparable harm" analysis. In contrast to the irreparable harm factor, the balance of harms analysis examines the harm of granting or denying the injunction upon both parties to the dispute, as well as to other interested parties. *Dataphase*, 640 F.2d at 114. The balance of harms must tip decidedly toward the plaintiffs to justify issuing a preliminary injunction. *See Lynch Corp. v. Omaha Nat'l Bank*, 666 F.2d 1208, 1212 (8th Cir. 1981). In analyzing the balance of harms, the district court may look to, amongst other things, the threat to

---

[8] It has been brought to the Court's attention that Mediacom intends to file a complaint with the FCC against Sinclair alleging violations of the good faith negotiation requirement. Def.'s Supp. Mem. in Opp'n to Pl.'s Mot. for a Prelim. Inj. at ¶ 4. If Mediacom is, in fact, intending to file such a complaint, it only lends further support to the Court's conclusion that Mediacom will not suffer irreparable harm if the preliminary injunction is not granted. *See Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) (stating courts should be aware of industry regulations).

the rights of the parties and the threat to the financial stability of the parties. *See Moore Bus. Forms*, 953 F. Supp. at 1067 (balancing the financial impact on the parties).

Here, although Mediacom may suffer loss in goodwill and reputation, there is no indication that denying the preliminary injunction would result in Mediacom's bankruptcy, reduction in its work force, or any other such drastic harm. Mediacom insists that the granting or denying of the preliminary injunction in this case directly effects other interested parties, i.e., its subscribers. That is, Mediacom subscribers would suffer irreparable harm, in that they would be forced to seek out DBS companies at higher prices, or be forced to stay with Mediacom with less programming options. Pl.'s Mot. at 14-15. The Court disagrees. As previously discussed, any harm that Mediacom subscribers may suffer are tangible and quantifiable, and there is more than an adequate remedy at law in the form of compensatory damages.

Sinclair, on the other hand, has a right to enforce a contract provision entered into by two informed, sophisticated businesses. Certainly, granting the injunction would not critically injure Sinclair's overall business, as any negotiations that may be reached in the future could provide for a retroactive compensation date that would make Sinclair whole. However, the Court is reluctant to force Sinclair to maintain a business relationship with Mediacom when both parties clearly contemplated, and agreed to, a termination provision. In *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, the Supreme Court explained that the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business . . . to exercise his own independent discretion as to parties with whom he will deal." 540 U.S. 398, 408 (2004) (citation omitted). Accordingly, the balance does not tip decidedly toward Mediacom and weighs against granting the preliminary injunction.

C. *Probability of Success on the Merits*

The third factor the Court must consider in deciding whether to issue a preliminary injunction is the likelihood that Mediacom will succeed on the merits. Mediacom argues that there is a substantial likelihood that it will prevail on the merits of the antitrust claim because Sinclair's actions constitute an illegal *per se* tying arrangement. A tying arrangement occurs when a party uses its market power in the tying product to force customers to buy the tied product, thereby harming competition. *See Jefferson Parish Hosp. v. Hyde*, 466 U.S. 2, 14 (1984) (finding tying arrangements are unlawful when forcing occurs). Typically, most antitrust claims are analyzed under the "rule of reason," which questions whether the practice at issue imposes an unreasonable restraint on competition. *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir. 1998). But certain types of restraints, including tying arrangements, have, in the past, been deemed so inherently anticompetitive that they were considered illegal *per se*.[9] *See id*. Thus, the Court must first determine if there was an illegal tying arrangement, and whether that tying arrangement, if any, was *per se* illegal.

1. *Illegal tying: did Sinclair coerce Mediacom?*

As an initial matter, "there is nothing inherently anticompetitive about packaged sales." *Jefferson Parish*, 466 U.S. at 25. Packaged sales, or tying arrangements, are violations of antitrust law only if "the defendant has *coerced* buyers into purchasing a product which such buyers otherwise would not have purchased or would have purchased from a different source

---

[9] However, in light of the recent Supreme Court decision, *Illinois Tools Works Inc. v. Independent Ink, Inc.*, 126 S. Ct. 1281 (2006), the application of the *per se* doctrine in antitrust cases, which side-stepped the market power analysis, should be approached with caution. The Supreme Court also noted that its "strong disapproval of tying arrangements has substantially diminished" over the years. *Id.* at 1286.

other than the defendant." *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1499 (8th Cir. 1992) (emphasis added). To determine whether Sinclair's packaged offer constituted illegal tying, the threshold inquiry becomes whether Sinclair coerced Mediacom. *See Jefferson Parish*, 466 U.S. at 12 (concluding when "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated).

Here, Mediacom asserts that Sinclair's conduct is illegal tying because even though Mediacom did not want to purchase the Tied Stations, given Sinclair's take-it-or-leave-it packaged offer, it must purchase the retransmission rights of the Tied Stations to purchase the retransmission rights of the Tying Stations. Mediacom explains that throughout the negotiations, Sinclair attempted to force Mediacom to enter into an agreement that included both the Tying and the Tied Stations. Pascarelli ¶ 10. Sinclair maintained its position even after Mediacom explained it was only interested in negotiating for the Tying Stations. *Id.* ¶ 8. Mediacom informed Sinclair that there was little value assigned to carrying the Tied Stations due to low consumer demand, and due to that fact Mediacom felt that it could make higher value use of the channels that the Tied Stations currently occupied with Mediacom. Bedford ¶ 3. Sinclair, nonetheless, forced Mediacom to buy the Tied Stations by only offering a bundled package. Levinsohn at 30-32. Mediacom claims that "Sinclair will not allow Mediacom to purchase retransmission rights for any one station, or any group of stations, except as part of a single package that includes payment for Mediacom's retransmission of all of the Sinclair stations." Pl.'s Mot. at 8-9. Mediacom further contends that Sinclair's October 10, 2006 letter, which offered a station-by-station proposal, should not dispel the existence of a tying arrangement. Mediacom states that the October 10 offer is a sham because, based on the proposed prices of the

individual station's retransmission rights, purchasing the packaged offer is the "only viable economic option" for Mediacom. Pl.'s Supp. Auths. in Supp. of Pl.'s Mot. for Prelim. Inj. (hereinafter "Pl.'s Supp.") at 1-2 (citing *Amerinet*, 972 F.2d at 1498).

In response, Sinclair contends that its actions did not amount to unlawful tying because it did not force or coerce Mediacom to carry the Tied Stations. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. (hereinafter "Def.'s Opp'n") at 8. Specifically, on October 10, 2006, just a day prior to Mediacom filing the instant motion for preliminary injunction, Sinclair offered to negotiate on a station-by-station basis. *See* Faber Ex. 1. Generally, the conditions at the time of the hearing, rather the commencement of the suit, will be the basis for any injunctive relief. Because "equity interposes by injunction to prevent only future acts, conduct that [has] been discontinued before or after a suit is brought to restrain such conduct is generally an insufficient basis for injunctive relief." 42 Am. Jur. 2d Inj. §3 (2006). However, the discontinuance of wrongful or illegal conduct does not alone warrant the denial of injunctive relief. To determine whether the discontinued course of conduct should be enjoined, courts consider the genuineness of an expressed intent to not repeat the conduct, the effectiveness of the discontinuance, and the character of past violations. *Id.* Although Mediacom asserts that Sinclair's October 10 letter was a sham, it appears that Sinclair effectively discontinued any alleged tying arrangement by offering Mediacom the option to purchase the retransmission rights on a station-by-station basis. Faber Ex. 2. Moreover, any alleged tying arrangement that Sinclair may have previously offered Mediacom expired on October 5, 2006. Supp. Decl. of Barry Faber (hereinafter "Faber Supp.") ¶ 7. Thus, but for the offer outlined in Sinclair's October 10 letter, there is currently no other offer, legal or illegal, that Mediacom can accept or reject.

Mediacom's only effort to show that the October 10 proposal was not effective in discontinuing Sinclair's alleged tying arrangement is to argue that the October 10 offer amounted to an "economic tie." That is, although it appears on its face that Mediacom had a choice between the packaged offer and the station-by-station offer,[10] taking the packaged offer was the "only viable economic option" because under the October 10 proposal, Mediacom would be paying one million dollars more to purchase only the retransmission rights for the Tying Stations, on a station-by-station basis, as opposed to purchasing the retransmission rights for both the Tying and the Tied Stations under the packaged offer. Pl.'s Supp. at 1. It is true that the Eighth Circuit has noted that a tying arrangement may be shown if the defendant's policy makes purchasing of the tying and the tied products together the *only* viable economic option, however, in this instance, Mediacom has not demonstrated that the October 10 offer was the only viable economic option. Specifically, Mediacom has not shown that the offer would be "prohibitedly more" than the packaged offer. *See Amerinet*, 972 F.2d at 1500-01. One million dollars is a substantial amount in the abstract, however, for Mediacom, a multi-million dollar company, one million dollars may not have such a significant impact as Mediacom suggests. For Mediacom, there may be business considerations that make the station-by-station offer more attractive, despite the higher cost. Mediacom has previously pointed out that it could make "higher value use" of the channels that are currently being occupied by the Tied Stations. It is unclear to the Court whether Mediacom's intended "higher value use" of the channels would justify the additional one million dollars, but it is likewise unclear to the Court that the additional

---

[10] As noted above, Sinclair's previous offer expired on October 5, 2006, and there was no "packaged offer" that Mediacom could elect as of October 6, 2006. Faber Supp. ¶ 7.

one million dollars to purchase only the retransmission rights of the Tying Stations would be "prohibitedly more," as to make the packaged offer the "only viable economic option." This is particularly true in light of the fact that, in Mediacom's Form 8-K,[11] Mediacom stated: "Sinclair is seeking compensation that we believe to be in excess of what is appropriate, although that amount *is not material* to our results of operations or financial condition." Faber Ex. 36 (Mediacom's Form 8-K filed September 28, 2006) (emphasis added). Therefore, based on the speculative evidence before it, the Court cannot conclude that Sinclair's packaged offer was the only viable economic option for Mediacom.

Even assuming the October 10 letter did not discontinue the alleged tying arrangement, after a thorough review of the record, it does not appear that Mediacom was coerced to carry the Tied Stations. To wit, Mediacom carries the Tied Stations today, and Mediacom has been, and is still willing to carry the Tied Stations in the future. *See* Faber ¶¶ 16, 19, 20 and corresponding exhibits (e-mail from Mediacom to Sinclair stating, "we prefer to have these stations included in our discussions with you"; letter from Mediacom to Sinclair "we will continue analog carriage of the stations that are presently affiliated with UPN or WBN [the Tied Stations]"). Under the current retransmission agreement, Mediacom has the absolute right to terminate the carriage of any one of Sinclair's twenty-two stations, provided Mediacom gives 45 days advance written notice. *See* Pascarelli Exs. 2, 3. Up until Sinclair gave its own notice of termination to Mediacom on September 28, 2006, Mediacom had the right to terminate the carriage of any, or all, of the Tied Stations. Mediacom, however, never previously exercised its right to terminate

[11] Form 8-K is a document that public companies, such as Mediacom, must file with the Securities and Exchange Commission to announce certain significant changes.

the carriage of the Tied Stations. Despite this fact, Mediacom argues that, at this juncture it is being *forced* to carry the Tied Stations. The Court disagrees. During negotiations, Mediacom was informed by Sinclair that Mediacom could carry only the Tying Stations, but would have to pay a higher price. Faber Ex. 20. It is true that Sinclair may have been offering both the Tying and Tied Stations together for a lower net price, but that itself does not constitute an illegal tying arrangement. This is especially true given that Mediacom has not provided any evidence that the prices Sinclair sought for the Tying or the Tied Stations were above fair market value. That is, "[w]here the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit single price." *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir. 1996) (quoting *N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 6 n.4 (1958)). This philosophy of buy more, save more, is encountered by consumers in everyday life, where consumers are given the choice to realize higher savings by buying in bulk, e.g., buy two get one free.

Moreover, the Nielsen viewer ratings data does not weigh in favor of the notion that Mediacom was being forced to carry the Tied Stations. *See* Faber Ex. 3. Based on the number of viewers tuned in to the Tied Stations, it seems unlikely that Mediacom was being forced to carry the Tied Stations at the peril of other non-Sinclair stations it would have preferred to carry. The Court's reading of the May 2006 Nielsen Media Research data on prime-time share of viewing households shows that the Tied Stations have ratings as high as, or often times higher than, other cable channels carried by Mediacom. *Id.* Thus, purely from the number of viewers with televisions tuned in to the Tied Stations, it seems unlikely that Mediacom would choose to discontinue the Tied Stations with higher viewer ratings, as opposed to other channels with much

lower viewer ratings, to free up its channels for other programs that Mediacom would allegedly rather carry. *See id.* Although Mediacom has every business right to drop whatever station and program that it wishes, the evidence does not support the conclusion that Mediacom is being forced to carry the Tied Stations. The Court concludes, for the purpose of the present motion, that Mediacom will not likely succeed in its attempt to establish an illegal tying arrangement because Mediacom is not being coerced into carrying the Tied Stations. However, even assuming that there was a tying arrangement, Mediacom has failed to establish that the tying arrangement was illegal *per se.*

2. *Is the alleged tying arrangement illegal* per se*?*

To demonstrate an illegal *per se* tying arrangement, Mediacom must show that: (1) two distinct products or services were involved in a tie; (2) Sinclair had sufficient power in the tying product's market such that it was capable of restraining competition in the tied product's market; and (3) the amount of interstate commerce in the tied product's market was not insubstantial. *Amerinet*, 972 F.2d at 1499. Mediacom addresses the first element by claiming that the Tying Stations and the Tied Stations are two distinct services. That is, the Tying Stations and the Tied Stations are in different and unrelated geographic markets with no overlap in service area or commonality in audience. Pascarelli at ¶ 7. Second, Mediacom alleges that Sinclair has sufficient market power in the Tying Stations to restrain competition in the Tied Stations market. Third, Mediacom contends that a substantial amount of interstate commerce in the tied product's market would be impacted by the illegal tie. Specifically, given Mediacom's 625,000 subscribers receiving Sinclair stations, the financial impact on Mediacom and its subscribers will exceed millions of dollars. Pl.'s Mot. at 12-13; Pascarelli Supp. ¶ 5.

In opposition to Mediacom's argument, Sinclair argues that there is only one product at issue, i.e., retransmission rights, as opposed to the two products, Tying and Tied Stations, asserted by Mediacom; that Sinclair does not have market power in the tying product's market; and that its conduct did not foreclose competition in the tied product's market. *See* Def.'s Opp'n at 11-14. Because the determination of whether the tying arrangement is illegal *per se* does not hinge on the first element (two distinct products), the Court will address elements two and three.[12]

a. *Did Sinclair have market power in the tying product's market sufficient to restrain competition in the tied product's market*?

Antitrust laws draw a distinction between exploitation of market power, on the one hand, and attempting to impose restraints on competition. *See Jefferson Parish*, 466 U.S. at 14. Thus, when a "seller's power is just used to maximize its return in the tying product market, where presumably its product enjoys some justifiable advantages over its competitors, the competitive ideal of the Sherman Act is not necessarily compromised." *Id.* The essence of a *per se* tying claim is that Sinclair has such market power in the tying product's market (the Tying Stations), that it could force Mediacom to buy the tied product (the Tied Stations), and thereby restrain competition in the tied product's market. *See, e.g., Baxley-DeLamar Monuments, Inc. v. Am. Cemetery Assoc.*, 938 F.2d 846, 850 (8th Cir. 1991). Stated differently, Sinclair's Tying Stations are so popular that Sinclair has the power (market power) to force Mediacom to buy Sinclair's

---

[12] During the preliminary injunction hearing, counsel for Sinclair stated that there was only one product, retransmission rights, but that Sinclair would not press that point. Hr'g Tr. at 68. Mediacom's assertion that there are two distinct products is based on its own interpretation of viewer preferences and does not cite any authority holding that programming of major network affiliated stations is a distinct product from programming of non-major network affiliated stations.

"inferior product," the Tied Stations.

In support of its claim, Mediacom states that Sinclair has market power (in the Tying Station markets) because Mediacom has no alternative source for major network programming other than those offered by Sinclair. The source of Sinclair's market power is the exclusive hold each of the Tying Stations have on popular network programming in Mediacom's local service areas. Levinsohn at 30-32. Because this popular network programming is considered essential by Mediacom subscribers, Mediacom argues that Sinclair has sufficient market power to force Mediacom to buy the retransmission rights for the Tied Stations, as a condition for buying the retransmission rights for the Tying Stations. *Id.*

Mediacom cites to *In re General Motors Corp.*, 19 FCC Rcd. 473, ¶ 202 (2004), for the proposition that major network affiliated broadcasters possess significant market power because "signals of local television broadcast stations are without close substitute." In *In re General Motors*, the FCC found that News Corporation, the broadcaster, had significant market power, in part, on the fact that the signals of local television broadcast stations were without close substitutes, but mainly because News Corporation owned thirty-five television broadcast stations, a television broadcast network, ten national cable programming networks, twenty-two regional cable programming networks, and sought to acquire interest in another company that would effectively make News Corporation the sole programming provider and a direct competitor in the end-user aspect of the multichannel video programming distribution market. *Id.* at ¶¶ 3, 4. Thus, Mediacom's proposition that Sinclair has market power just because "signals of local television broadcast stations are without close substitute" is unpersuasive.

To demonstrate that Sinclair has market power in the tying product's market, Mediacom

has to first define the parameters of the market. Here, Mediacom considered the relevant market to be the market for retransmission rights for the analog signal of each Tying Station sold to cable operators.[13] Levinsohn at 20. Mediacom contends that each of Sinclair's major network affiliated broadcast stations (the Tying Stations) constitute a tying product market. *See* Levinsohn at 17-20. Thus, under Mediacom's analysis, there would be thirteen separate markets, one for each of the thirteen tying stations. Though Sinclair asserts that Mediacom's parameter of the tying product market is incorrect, even if such parameter is applied, Sinclair still does not have market power. Sinclair represents that its stations' shares do not exceed 15% of the Monday through Friday prime-time viewers in any of Mediacom's service areas. Faber ¶ 24; Faber Supp. ¶ 3. For example, Sinclair's FOX-affiliate station only has 9% of viewers and is tied for third for the share of Monday through Friday prime-time viewers in any of Mediacom's service areas. Faber ¶ 63. This percentage, Sinclair points out, is significant because the Supreme Court has held that a 30% market share was insufficient to establish market power. *See Jefferson Parish*, 466 U.S. at 26-27 (finding 30% market share alone insufficient to infer market power).

In this instance, the Court finds that Mediacom has failed to identify a proper market. Mediacom essentially asserts that each of the thirteen stations, the Tying Stations, constitute thirteen separate tying product markets. *See* Levinsohn at 17-20. This is so, Mediacom explains, because much of the network programming is so unique and "must see" that there is no

---

[13] Levinsohn explained that even if the relevant market is the market for transmission rights sold to Direct Broadcast Satellite operators and cable operators, or retransmission rights for the Tying Stations, it would still yield the same conclusion: Sinclair has market power. Levinsohn at 22-23.

substitute product. *See id.*; Pascarelli ¶ 7. For example, one of the tying product's market, that of KDSM, would be the area which contains the retransmission signal for KDSM. Levinsohn at 17. Thus, each of the thirteen Tying Station's markets would include one product – namely, that station's signal. *Id.* at 26. In *TV Communications Network, Inc. v. Turner Network Television,* the Tenth Circuit held that allegations that defendant TNT monopolized the market for TNT channels in the metropolitan Denver area did not properly allege a relevant market because "a company does not violate the Sherman Act by virtue of the natural monopoly it holds over its own product." 964 F.2d 1022, 1025 (10th Cir. 1992); *see also Double D Spotting Serv*., 136 F.3d at 561-61 (dismissing antitrust claim because plaintiff did not meet burden of defining relevant market). Here, not only does Mediacom fail to properly identify the tying product's market, it fails to identify the tied product's market. Since any inquiry into the validity of a tying arrangement must "focus on the market or markets in which the two products [tying and tied products] are sold, for that is where the anticompetitive forcing has its impact[,]" it is difficult for the Court to make the assessment of what the relevant markets are, or any anticompetitive impact therein, without any information on the tied product's market. *Jefferson Parish*, 466 U.S. at 18.

Having failed to identify the proper market, Mediacom attempts to establish market power through another method, the presumption of uniqueness. In the past, the Supreme Court held that a "presumption of uniqueness resulting from the existence of the copyright itself" was sufficient to demonstrate market power in the antitrust context. *See, e.g., United States v. Loew's Inc.*, 371 U.S. 38, 48 (1962). Stated differently, a copyright holder was presumed to have a unique product – the uniqueness of the product was presumed to have market power –

thus, a copyright holder was presumed to have market power without any other showing. However, the Supreme Court recently overruled that presumption, at least for patents. *Illinois Tools Works Inc. v. Independent Ink, Inc.*, 126 S. Ct. 1281 (2006) (overruling patent-equals-market power presumption). In *Illinois Tool Works*, the Supreme Court noted that in the past, without any analysis of actual market conditions, the Court "assumed that, by tying the purchase of unpatented goods to the sale of the patented good, the patentee was 'restraining competition'" and, in effect, assumed the "requisite economic power" over the tying product such that the patentee could "extend [its] economic control to the unpatented products." 126 S. Ct. at 1288-89 (citations omitted). After a review of legislative history, case law, scholarly comments, and change in position by the administrative agencies charged with enforcement of the antitrust laws, the Supreme Court categorically overruled that presumption and concluded that "a patent does not necessarily confer market power upon the patentee[,]" therefore, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Id.* at 1293. Applying the reasoning of *Illinois Tool Works* to this case, the Court finds that Mediacom did not meet its burden of proving Sinclair's market power in the tying product's market. Nevertheless, the Court will continue with it analysis and address the final element required to prove an illegal *per se* tying arrangement.

b. *Is the amount of interstate commerce in the tied product's market not insubstantial?*

In support of this third and final element, Mediacom claims that there is a substantial amount of interstate commerce in the tied product's market which would be impacted by the illegal tie. Mediacom explains that given its thousands of subscribers, if Mediacom pays Sinclair cash compensation per subscriber for all the Sinclair stations, including each of the Tied

Stations, the financial impact on Mediacom and its subscribers would exceed a million dollars. Pl.'s Mot. at 12-13.

Application of the *per se* rule focuses on the probability of anticompetitive consequences. The reason for the inquiry on interstate commerce in the tied product's market is to determine whether there is any likelihood of anticompetitive effect from the alleged tie, or stated differently, that a substantial volume of commerce would be foreclosed as a result of the tie. *See Jefferson Parish*, 466 U.S. at 16. Here, Mediacom may be correct that the per subscriber compensation that Sinclair seeks from the packaged offer may cost Mediacom in excess of a million dollars, which in part, would be passed down to Mediacom subscribers. That "fact," however, does not address how competition would be foreclosed in the tied product's market. That is, Mediacom's increased cost to purchase retransmission rights from Sinclair does not address how competition is foreclosed in the tied product's market. Moreover, Mediacom has not shown that Sinclair used its power in the Tying Stations to shelter an inferior product (the Tied Stations) from competition. *See Amerinet*, 972 F.2d at 1501. Based on the Nielsen viewer rating data discussed above, it seems reasonable to believe that the Tied Stations were in demand, or in higher demand, than Mediacom's other cable programs. *See* Faber, Ex. 3. In fact, Mediacom provides no evidence to suggest that there are any anticompetitive effects in the tied product's market as a result of Sinclair's alleged tying arrangement.

The argument that Sinclair's conduct was not anticompetitive is further supported by industry practice. Retransmission rights are routinely negotiated on a bundled basis, and the primary regulator in this industry, the FCC, has specifically found such practices to be lawful. Faber ¶ 5; *EchoStar Satellite Corp. v. Young Broad., Inc.*, 16 FCC Rcd. 15070 at ¶¶ 21, 29

(2001). The Supreme Court has stated that "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue [and] [p]art of that attention to economic context is an awareness of the significance of regulation." *Verizon*, 540 U.S. at 411. Following the Supreme Court's guidance, the Court looks to *In re Implementation of the Satellite Home Viewer Improvement Act of 1999*, where the FCC adopted rules implementing certain aspects of the Satellite Home Viewer Improvement Act of 1999. 15 FCC Rcd. 5445, 5469 (2000). The Rule provides:

> We believe that the following examples of bargaining proposals presumptively are *consistent with competitive marketplace considerations* . . .
>
> 3. Proposals for carriage conditioned on carriage of any other programming, such as a broadcaster's digital signals, an affiliated cable programming service, or another broadcast station either in the same or different market . . .
>
> We do not find anything to suggest that, for example, requesting an MVPD [multichannel video program distributor] to carry an affiliated channel, another broadcast signal in the same or another market, or digital broadcast signals is impermissible or other than competitive marketplace consideration.

*Id.* at 5469 (emphasis added). This alone seems to indicate that Sinclair's tying arrangement is not anticompetitive and is an accepted industry practice. Of course, just because such tying arrangements are "presumptively" permissible does not necessarily foreclose circumstances where tying arrangements may be impermissible. However, in this instance, the Court is presented with no evidence that suggests Sinclair's alleged tying arrangement foreclosed competition in the tied product's market.

Accordingly, having considered whether there is a tying arrangement in the first instance, and the elements to establish an illegal *per se* tying arrangement, the Court concludes that for purposes of the present motion, Mediacom is unlikely to succeed on the merits of its antitrust

claim because it is unlikely Mediacom can establish a tying arrangement in the first place, or establish an illegal *per se* tying arrangement. Accordingly, the probability of success on the merits factor weighs against granting the preliminary injunction.

D. *Public Interest*

The final *Dataphase* factor to consider is the public interest. Mediacom has not identified a public interest that has not already been considered under other factors. Mediacom reiterates its arguments that the illegal tying arrangement will increase prices for Mediacom subscribers,[14] that channel lineup will not reflect subscriber preferences but rather the preferences of Sinclair, and that this, in turn, will cause subscribers who prefer cable service to change services to DBS. Levinsohn at 34-36. Mediacom also submits letters from local government officials echoing those same concerns. *See* Supp. Pascarelli Exs. 1-10. During the preliminary injunction hearing, Sinclair's counsel stated that public interest was in competition – the interest that the antitrust laws were designed to protect. Thus, Sinclair argued public interest weighed in favor of denying the injunction because competition is preserved when parties bargain freely in free markets without intervention from regulators or the courts. The Court agrees.

Here, the public interest would not be served by preventing the free market from taking its natural course. Although Mediacom subscribers may experience some inconvenience from Mediacom's and Sinclair's inability to reach an agreement during negotiations – possibly in

---

[14] It appears to the Court that the price increase does not stem from the alleged illegal tying arrangement, but rather Sinclair's business decision to actively seek compensation for analog signals that it previously provided to cable operators, including Mediacom, for free. Faber ¶ 11.

interrupted viewing of their favorite programming – this inconvenience is outweighed by the greater public interest of assuring competition in the market place. As the Supreme Court has cautioned, "[m]istaken inferences and the resulting false condemnation 'are especially costly, because they chill the very conduct the antitrust laws are designed to protect.'" *Verizon*, 540 U.S. at 414 (citations omitted). Moreover, a court should not make companies deal with each other in instances where the court "cannot explain or adequately and reasonably supervise" the companies, or when the supervision would require the court to "assume the day-to-day controls characteristic of a regulatory agency." *Id*. at 415 (citation omitted). According, the Court concludes that the public interest does not weigh in favor of granting the preliminary injunction.

## III. CONCLUSION

After considering all of the *Dataphase* factors, the Court concludes that the balance of the equities do not support issuing a preliminary injunction. Specifically, the Court finds that: (1) Mediacom has not demonstrated that it will suffer immediate, irreparable antitrust injury if the preliminary injunction is not issued; (2) the balance of harms do not decidedly tip towards Mediacom; (3) Mediacom has failed to establish a probability of success on the merits of its antitrust claim; and (4) the public interest would not be served by a preliminary injunction. Mediacom's motion for a preliminary injunction (Clerk's No. 4), is therefore, **DENIED**, and Sinclair's Motion to Strike or, in the Alternative, to Grant Leave to Respond to Mediacom's Reply (Clerk's No. 34) is dismissed as moot.

IT IS SO ORDERED.

Dated this ___24th___ day of October, 2006.

ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT